[Civ. No. 1719. Fourth Appellate District.—June 26, 1935.]

D. JOSEPH COYNE, as Administrator, etc., Appellant, v. THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation), Respondent.

D. Joseph Coyne, *in pro. per.,* Roy H. Smith and McGee & Sumner for Appellant.

Loeb, Walker & Loeb and Sherman F. Selvin for Respondent.

BARNARD, P. J.—On May 9, 1932, the defendant issued to Augustine S. Coyne an annuity policy of insurance by which it agreed to pay to him $90.10 on June 9, 1932, if then living, and a like amount on the ninth day of each and every month thereafter so long as he lived. He was then 66 years of age and the policy was issued in consideration of a single premium of $10,000, which amount he paid in cash. He died by suicide on May 26, 1932, and before the first monthly payment became due under the policy. This action was brought by the administrator of his estate to recover the amount paid for the policy. The court found in all respects in favor of the defendant and from the judgment entered the plaintiff has appealed.

The first point raised is that the court erred in denying to the appellant a jury trial, it being claimed that he became entitled to this by reason of the filing of an amendment to the answer. The complaint was in three counts, the first alleging that the contract had been entered into while the intestate was mentally incompetent, the second alleging that the consideration for the contract had totally failed, and the third being a common count for money had and received. An answer was filed denying the allegations of the first two counts and omitting any reference to the third count. On September 22, 1932, the cause being at issue, the appellant filed a motion to set, accompanied by a memorandum in which a jury trial was expressly waived. On October 3, 1932, the cause was set for trial on November 30, 1932. On November 4, 1932, by stipulation of the parties and upon order of the court, an amendment to the answer was filed by which the essential allegations of the third count of the complaint were denied. On November 17, 1932, the appellant deposited $24 with the clerk, as a jury fee. On November 18, 1932, the appellant served notice upon the respondent that the case had been set for trial on November 30, 1932. Apparently the case was continued on November 30, 1932, and on December 23, 1932, the appellant served notice that on December 29, 1932, he would move to transfer the cause from the nonjury calendar to the jury calendar. Such a motion was heard and denied on December 29, 1932, and the cause finally came on for trial on January 10, 1933.

The third count of the complaint, for money had and received, is very brief and it is fully apparent that it depended

upon and arose out of the matters pleaded in the first two counts, which is confirmed by the fact that the evidence offered at the trial related entirely to the questions of mental competency and failure of consideration. Every material fact relied on to sustain the third count had been put in issue by the original answer to the first and second counts, and the amendment filed added nothing to the burden of proof resting upon the appellant. ■ A further consideration is that any possible revival or renewal of the right to have the case tried before a jury arose when the amendment was filed on November 4, 1932. Nothing was done for about two weeks when a jury fee was deposited and, although notice of trial was later served and the case was apparently called and continued on November 30th, nothing was done to bring the matter to the attention of the court until December 23d, when notice was given of such a motion. A jury was expressly waived in writing and we think the right thereto was not revived by the amendment in question (*Deberry* v. *Cavalier*, 113 Cal. App. 30 [297 Pac. 611]). In any event, any such right was waived by the subsequent delay in demanding a jury.

■ It is next urged that there was a total failure of consideration for this contract since the intestate died before any payments thereunder became due. No authorities are cited except two cases on the point that forfeitures are not favored in the law, it being argued that this contract never went into effect and that to permit the respondent to keep the money paid would constitute a forfeiture.

Annuity contracts of this nature are common and have been frequently upheld and approved by the courts. The value and purpose of such a contract are well summarized in *Hult* v. *Home Life Ins. Co.*, 213 Iowa, 890 [240 N. W. 218], where the court said:

"With amazing accuracy, actuaries are able to determine the amounts which can be paid, in the form of annuities, to people of certain age, for a given specified sum. The contracts in question were so determined. It is a matter of common knowledge that great numbers of such contracts are in existence. It is difficult to conceive how the deceased could have, in a better way, protected herself than by having purchased these contracts. She was getting along in years. The physical frailties incident to age were creeping upon her. The uncertainty of her future needs faced her. She had no

dependents. It remained for her to take care of herself only as best she could. She displayed excellent judgment in purchasing the contracts in controversy by which she was relieved of the worry and responsibility of keeping invested $30,000 of her property and at the same time securing for herself, with absolute certainty, annual payments much more than she needed except for the extraordinary expenses incident to emergencies such as ill health. The fact that she died soon after the contracts were taken out has no bearing on the question under consideration. She might have lived ten or even fifteen years longer, in which event the contracts would have been unprofitable to the insurance company instead of profitable, as they turned out to be. This was one of the risks and hazards assumed by the insurance company. This is one of the elements entering into the computation of the rate.

''Experience has shown, particularly in the last few years, that even those who consider themselves skilled in investments have found it impossible to recover reasonable rates of interest on their investments, and equally impossible to save much, if any, of the principal. With her annuity contracts in her possession, the deceased was relieved of all worry about interest and likewise all worry about her original investment. Both were secured to her for the entire period of her life, whatever it might prove to be.''

The contention that there was no consideration for this contract because the death of the annuitant occurred before any payments to him became due, is entirely without merit. The respondent had agreed to pay $90.10 to him each month so long as he lived and this agreement constituted an ample consideration. The fact that death occurred before any such payments became due does not change the situation and the intestate ran the risk of such an event just as the respondent ran the risk that the contract might turn out to be unprofitable to it in the event the other party thereto outlived his normal expectancy.

It is suggested that one paragraph of the policy is so worded that it might have given the deceased the understanding that upon his death something was to go to his heirs. Nothing in the paragraph referred to could have given the deceased any such impression, and the entire contract clearly sets forth a contrary intent. Further, the evidence shows that the deceased was fully informed as to the meaning of

the policy and that he deliberately chose a form of contract which would give him the highest possible monthly return during his lifetime, with no remainder to his heirs.

■ It is next contended that an annuity contract of this nature was *ultra vires* as to the respondent and that, under its articles of incorporation and the statute under which it was organized, it was not permitted to make such a contract. The respondent was organized under an act approved April 2, 1866 (Stats. 1865–66, p. 752). Section 1 of that act authorized the forming of such a company "for the purpose of making insurance on the lives or health of individuals, or against accidents to them, and every insurance appertaining thereto or connected therewith, and to grant, purchase and dispose of annuities." In section 3 of that act it is provided that "every company organized under this Act shall have power to make insurance upon any or all of the risks, and to do any or all of the business mentioned in section one. . . . " The respondent's articles of incorporation, dated December 28, 1867, provide, as permitted in the act, that its term of existence shall be seventy-five years and· sets forth that its object is "to make insurance upon any and all of the risks, and to do any and all of the business mentioned and provided for in the Act" referred to.

The appellant first argues that a contract for an annuity is not a contract of insurance and that the above-quoted language used in section 1 of the act does not permit the writing of an annuity policy unless the same is connected with an insurance contract. We cannot accept such a construction of the language used, and we think it sufficiently appears that it was intended to authorize both the making of insurance contracts and contracts for annuities.

■ It is further contended that the respondent was without power to write such a contract because the act of 1866 could not grant such a power since its title refers only to insurance contracts and not to contracts for annuities. Conceding, but not holding, that the title to that act was not broad enough to cover such contracts, it is well settled that a statute passed prior to the adoption of the Constitution of 1879 was not subject to the limitation referred to (*In re Boston* Min. & Mill. Co., 51 Cal. 624; *Ex parte Liddell,* 93 Cal. 633 [29 Pac. 251]; *Balzano* v. *Traeger,* 93 Cal. App. 640 [270 Pac. 249].)

A number of rulings on the admission of evidence are attacked as prejudicial to the appellant. These all relate to the

question of the intestate's mental competency and it may first be observed that the sufficiency of the evidence to sustain the court's finding in that regard is not attacked and that in each instance where a complaint is made of the court's refusal to permit questions to be answered, no offer of proof was made and there is nothing to indicate that any of the rulings, if erroneous, were prejudicial. █ It is first contended that one of the appellant's witnesses should have been permitted to relate a conversation between the witness' wife and the deceased. While it is now argued that this was admissible for a limited purpose, no such limitation was indicated at the time the question was asked. It further appears that the question related to the deceased's state of mind at a time some twenty years before the execution of the contract here in question and the witness did state that the conversation "was more as a joke". Certainly no reversible error appears.

█ It is next urged that the court erred in striking out a part of an answer to a question made by a doctor in his deposition. The question was as to whether the witness had formed an opinion as to the probable length of time the intestate had been in a certain mental condition about which the witness had been speaking. Five words were struck from the witness' answer and not only are we unable to see how this in any way prejudiced the appellant, but, in his answer to the next question, the witness stated that he had not been able to determine how long the intestate had been in that condition.

█ Error is next assigned in the refusal of the court to permit a doctor to give an opinion as to whether, at the time of his examination, the decedent was "able to comprehend an ordinary business transaction or a contractual contract and the like". Not only was this question improper (*Langenbeck* v. *Louis*, 140 Cal. 406 [73 Pac. 1086]) but it appears that the examination in question was made on May 25, 1932, more than two weeks after the contract with which we are here concerned was executed. (See *Estate of Perkins*, 195 Cal. 699 [235 Pac. 45], and *Estate of Dolbeer*, 149 Cal. 227 [86 Pac. 695, 9 Ann. Cas. 795].)

█ Finally, objection is made to a hypothetical question which the court permitted to be asked of a doctor called by the respondent, it being now claimed that the question omitted certain facts which appeared in evidence. It is well settled that such a question may be framed upon a theory of the questioning party and in accordance with facts fairly de-

ducible from the evidence, and that it need not necessarily include a statement of all of the evidence in the case (*Treadwell* v. *Nickel*, 194 Cal. 243 [228 Pac. 25]; *Perkins* v. *Sunset Tel. & Tel. Co.*, 155 Cal. 712 [103 Pac. 190]; *Hallawell* v. *Union Oil Co.*, 36 Cal. App. 672 [173 Pac. 177]). Moreover, we have here the rather unusual situation that the question attacked was so amended as to include everything for which the appellant then asked, and that in its final form it contained, in effect if not in exact language, practically everything which it now claimed was omitted. After the question was asked counsel for appellant objected that much of the testimony favorable to him had not been incorporated therein. Counsel for respondent then stated that he had attempted to set up all of the facts and offered to insert any others to which his attention was called. Counsel for the appellant then suggested a number of matters which were inserted. The trial judge then compared the question with his notes on the evidence, making some suggestions which were included in the question, and then requested the appellant's attorney to specify any further particulars in which the question was not in accord with the evidence. Counsel for the appellant finally agreed that the corrections covered his objections "in the main" and suggested no further additions. He then complimented counsel for the respondent for his fairness in drawing the question but objected to the same on the ground that it did not cover all of the evidence but without specifying any respect in which it was lacking. Not only do we think that the question in its final form was unobjectionable but, under the circumstances, the appellant must be held to have waived any objection thereto.

We have carefully gone over the entire record and are unable to find any error therein which would justify a reversal of the judgment.

The judgment is affirmed.

Marks, J., and Harden, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1935.